NOT DESIGNATED FOR PUBLICATION

No. 113,161

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of J.W.,
Date of Birth: 03/05/2010,
A Child Under the Age of 18 Years.

MEMORANDUM OPINION

Appeal from Johnson District Court; KEVIN P. MORIARTY, judge. Opinion filed November 6, 2015. Affirmed.

*Richard P. Klein*, of Olathe, for appellant natural mother.

*Shawn E. Minihan*, assistant district attorney, and *Stephen M. Howe*, district attorney, for appellee.

Before MALONE, C.J., BRUNS, J., and ROBERT W. FAIRCHILD, District Judge, assigned.

*Per Curiam*:  L.W., the natural mother of J.W. (Mother), appeals the district court's order terminating her parental rights. For the reasons stated herein, we affirm the district court's judgment.

FACTS

On March 29, 2012, the State filed a child in need of care (CINC) petition in support of J.W. The petition was filed after police found Mother unresponsive in an automobile with her minor child, J.W., in the car. Mother did not appear at the temporary custody hearing, and the district court found an emergency existed that threatened J.W.'s safety and that returning J.W. to Mother's care was contrary to J.W.'s welfare. The district

1

court stated that it had "serious concerns regarding drug abuse by [M]other." The court assigned KVC (formally Kaw Valley Center) to J.W.'s case.

On June 29, 2012, after the appointment of counsel, Mother entered a no contest statement in response to the CINC petition. On August 22, 2012, the district court found that J.W. was a child in need of care pursuant to K.S.A. 2014 Supp. 38-2202(d)(1)-(3). The court then found that the disposition plan would be to reintegrate J.W. into Mother's home.

By October 2012, KVC allowed Mother to have unsupervised day visits with J.W. from 9 a.m. until 5 p.m. KVC also was considering an aftercare referral. By late October 2012, Mother was having unsupervised, overnight visits with J.W.

In November 2012, however, the reintegration process stalled. Mother failed several urinalysis examinations (UA), testing positive for PCP, THC, and cocaine. As a result, Mother was no longer allowed unsupervised visitation and was required to submit to random UAs. Mother's relationship with her mental health case manager also began to deteriorate at this time. Communication between Mother and her case manager had decreased. The case manager became "concerned about [Mother's] engagement . . . [and] about possible relapse," and she believed Mother was not taking her medication.

KVC continued to require Mother to submit to UAs in the winter and spring of 2013. KVC advised Mother if she completed several clean UAs through its random testing system, it would increase her visitation to monitored visits. In March 2013, after Mother achieved three clean UAs, KVC allowed Mother to resume monitored visitation with J.W. By mid-April 2013, Mother had completed two monitored visits, and her UAs remained clean. As a result, KVC granted Mother unsupervised day visits with J.W. During these visits, J.W.'s foster parent would drop J.W. off at Mother's apartment, where they would spend the day.

On May 17, 2013, J.W.'s foster parent dropped J.W. at Mother's apartment for a scheduled unsupervised day visit. When the foster parent returned later that day to pick J.W. up, Mother and J.W. were not present at Mother's apartment. J.W.'s foster parent tried to call Mother's cell phone, but Mother's phone was turned off. After being unable to reach Mother for 20 to 30 minutes, J.W.'s foster parent notified law enforcement. Mother finally returned approximately 1 hour after J.W.'s scheduled return time, claiming "[J.W.] had gotten to the clock in her car and changed the time and that her cell phone currently wasn't working."

In August 2013, KVC suspended Mother's visitation privileges. Despite the suspension of her visitation, Mother resumed providing urine samples at this time; she also maintained fairly consistent contact with KVC.

In January 2014, KVC assigned a new case manager to J.W.'s case. Mother continued to submit to random UAs. Typically, in conjunction with the UAs, Mother and J.W.'s case manager would discuss the progress of J.W.'s case. Although Mother told the case manager that she was attending counseling, Mother never provided documentation of her attendance at either counseling sessions or Narcotics Anonymous meetings. Between January 2014 and the May 2014 termination hearing, Mother did not have visitation privileges with J.W.

On May 29, 2014, the district court held a termination hearing. Mother testified on her own behalf and called her drug counselor as a witness. Mother's drug counselor explained that Mother attended group therapy twice a week from December 2013 through April 2014. At that time, Mother was successfully discharged from the program. Mother also testified about her living and employment situation. Mother stated that she had maintained full-time employment for over 2 years. Mother also stated that during this period she maintained a permanent home, appropriate transportation, insurance, and a driver's license.

Mother did admit that she was a victim of domestic abuse in the past. In 2010 and 2011 Mother's former boyfriend abused her on multiple occasions, leading to the filing of criminal charges against him. Later, in 2013, Mother began a relationship with a coworker, which also involved domestic abuse and criminal charges. Mother denied that J.W. was ever present during any of domestic abuse incidents.

At the conclusion of the evidence, the district court found Mother was unfit pursuant to the provisions of K.S.A. 2014 Supp. 38-2269(b)(1) through (b)(4). However, the district court did not terminate Mother's parental rights at that time. The judge explained:

> "[T]here is some foreseeability that [Mother] can get it together.
>     . . . .
>     ". . . I think it's powerful testimony that you have maintained a job, hard work working for McDonald's, that you have a home, that you've maintained sobriety for seven months, that you—The Court believes that you're trying. I see more hope in you than I do a lot of people that are similarly situated."

The district judge further noted, "I do believe that your mental health issues have to be addressed. You just can't go to Johnson County Mental Health for medication. . . . Whatever is required, you have to follow through on it."

Following the termination hearing, KVC resumed efforts to reintegrate J.W. into Mother's home. Mother's first visit with J.W. occurred on June 9, 2014. KVC assigned a new case manager, Kelly Hastings, to J.W.'s case at that time. By the first visit, Mother had not seen J.W. for nearly an entire year because the therapist advised against visitation.

On July 7, 2014, Mother attended a worker/parent conference to discuss the case plan tasks. At the conference, Mother did not provide proof of progress on her case plan

4

tasks. Hastings encouraged Mother to engage in mental health services as quickly as possible because, as had been discussed in the case plan meeting, one of the biggest missing pieces that KVC was looking for was mental health counseling.

When the visitation with Mother resumed, J.W. began to act out. J.W.'s foster parent noticed J.W. "was having a very difficult time at school with just an increase in his level of aggression towards both peers and teachers. And he had flipped some tables, hit some teachers, and was just, you know, being aggressive towards the other children."

After the July worker/parent conference Hastings observed that the visits between Mother and J.W. were appropriate. However, Hastings also noted that Mother tried to bring toys to a visit, despite being told it was prohibited. During a telephone conversation, Hastings asked Mother whether she had enrolled in a mental health program. Mother responded that "she really didn't have plans to do so because she didn't feel like she needed mental health services." Also, during this conversation, Mother told Hastings that she was pregnant. Hastings stated that since Mother already struggled to complete the case plan tasks, Hastings was concerned that the responsibility of another child would make it even more difficult for Mother to complete the case plan.

By the fall of 2014, Mother had moved to Missouri. An interstate compact for placement of children had not been approved before Mother's relocation. Mother continued supervised visits, although she cancelled them on a few occasions. Mother completed a Love and Logic parenting class. Mother did not provide proof of enrollment in a mental health program to KVC until December 2014. The documents Mother provided did not include information about the nature and extent of the program.

On December 10, 2014, the district court held a hearing to determine whether it was likely that Mother's unfitness would change in the foreseeable future. Pauline Johnson, a licensed master's level clinical social worker and registered nurse, testified for

5

the State. Johnson testified that she was J.W.'s counselor and she started seeing J.W. on a weekly basis beginning in July 2013. Johnson diagnosed J.W. with posttraumatic stress disorder and oppositional defiant disorder. Johnson explained that she worked with J.W. about his anger issues and physical aggressiveness towards teachers and peers. Johnson further stated that J.W. had a hard time controlling his impulses.

Because of J.W.'s behavioral issues, Johnson wanted to limit J.W.'s visitation with everyone, including his mother. One year before the foreseeability hearing, Johnson recommended that KVC terminate visitation between J.W. and Mother. Johnson acknowledged that her decision was solely predicated on J.W.'s behavioral issues and not based on Mother's actions.

Johnson primarily worked with J.W. on implementing effective coping strategies to manage his anger and anxiety. Johnson testified that she believed stability was very important for J.W. Johnson further stated that J.W. needed "consistent caregivers, and, you know, just knowing what to expect, you know, a permanent place to live just so he knows what's expected everyday and that's—that would be beneficial for him." Johnson concluded that J.W.'s aggressive outbursts were exacerbated by his lack of stability and that when there was a change in his life, his misbehaviors increased.

Following Johnson's recommendation that J.W. not visit with Mother, J.W. remained in his foster family's home with breaks when he was in respite care. Johnson testified that the spikes in J.W.'s behavioral issues occurred as a result of transitions between the homes. Johnson stated that the spikes in behavioral issues were not related to Mother's actions, because Mother did not have visitation with J.W. during this period. However, Mother had never sought mental health counseling for J.W. and never attempted to contact Johnson after she began therapy with J.W. Johnson explained that once J.W.'s behavioral issues stabilized she would have been open to allowing visitation with Mother.

At the conclusion of the evidence, the district court found that Mother's unfitness was not likely to change in the foreseeable future. The district court recognized Mother's triumph over drug addiction but concluded that her mental health issues were still unresolved. The court found that because of these issues Mother would never be able to properly care for J.W. The district court also found that termination of Mother's parental rights was in J.W.'s best interests. The district court explained that J.W. needed permanency and, after 4 years in the system, it was not fair to J.W. to delay establishing permanency any longer. Mother timely appealed.

ANALYSIS

Mother raises two issues on appeal. First, Mother contends the district court's finding that the conditions rendering her unfit were unlikely to change in the foreseeable future was not supported by clear and convincing evidence. More specifically, Mother claims that she remained drug free, did not exhibit signs of mental health issues, removed herself from an abusive relationship, and demonstrated an ability to parent by raising another child.

Second, Mother asserts the district court abused its discretion when it found that termination of her parental rights was in J.W.'s best interests. Mother argues that since KVC granted her day-long and overnight visits and she had successfully raised another child, reintegration was in J.W.'s best interests.

Our Supreme Court has established that an appellate court should apply the following test in a CINC case: "In short, when an appellate court reviews a trial court's determination that a child is in need of care, it should consider whether, after review of all the evidence, viewed in the light most favorable to the State, it is convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence, that the child was a CINC." *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594

7

(2008). In making this determination, an appellate court does not reweigh conflicting evidence, judge the credibility of witnesses, or redetermine questions of fact. 286 Kan. at 705. The same is true for cases involving termination of parental rights.

As the trier of fact, the district court is in the best position to determine the best interests of a child, and an appellate court will not disturb the district court's judgment in the absence of an abuse of discretion. *In re K.P.*, 44 Kan. App. 2d 316, 322, 235 P.3d 1255, *rev. denied* 291 Kan. 911 (2010). Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable. If reasonable persons could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. See *Miller v. Johnson*, 295 Kan. 636, Syl. ¶ 12, 289 P.3d 1098 (2012).

K.S.A. 2014 Supp. 38-2269(a) provides that when a child is adjudicated a child in need of care, the district court may terminate a parent's rights if the moving party establishes, by clear and convincing evidence that "the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." If the district court finds the parent unfit, the court must then determine whether termination of parental rights is in the child's best interests. K.S.A. 2014 Supp. 38-2269(g)(1).

*Fitness*

The Revised Kansas Code for Care of Children provides a nonexclusive list of factors the district court must consider when determining whether a parent is unfit. K.S.A. 2014 Supp. 38-2269(b) and (c). That statute also provides that the existence of any one of these factors "standing alone may, but does not necessarily, establish grounds for termination of parental rights." K.S.A. 2014 Supp. 38-2269(f). In Mother's case, the district court based its finding of unfitness on the following statutory factors:

8

- K.S.A. 2014 Supp. 38-2269(b)(1). Mother suffered from emotional illness, mental illness, mental deficiency, or physical disability of such duration or nature as to render her unable to care for the ongoing physical, mental, or emotional needs of J.W.;

- K.S.A. 2014 Supp. 38-2269(b)(2). Mother's conduct toward J.W. was of a physically, emotionally, or sexually cruel or abusive nature;

- K.S.A. 2014 Supp. 38-2269(b)(3). Mother used narcotic or dangerous drugs of such duration or nature as to render her unable to care for the ongoing physical, mental, or emotional needs of J.W.; and

- K.S.A. 2014 Supp. 38-2269(b)(4). Mother physically, mentally, or emotionally abused or neglected or sexually abused J.W.

Mother does not contest the district court's finding of unfitness. An appellant waives or abandons an issue by not briefing it. *State v. Holman*, 295 Kan. 116, 125, 284 P.3d 251 (2012).

*Foreseeable future*

The issue before this court is whether clear and convincing evidence supported the district court's finding that Mother's unfitness was unlikely to change in the foreseeable future. See K.S.A. 2014 Supp. 28-2269(a). An appellate court measures the "foreseeable future" from the child's perspective, considering the child's perception of time. *In re R.S.*, 50 Kan. App. 2d 1105, 1117, 336 P.3d 903 (2014).

In this case, clear and convincing evidence established Mother's mental health issues were unlikely to change in the foreseeable future. Although Mother demonstrated improvement by successfully completing drug rehabilitation and removing herself from

an abusive relationship, Mother still had unresolved mental health issues. The district court determined Mother's mental health issues were significant enough, standing alone, to warrant its foreseeability finding. The district court's conclusion is supported by the record. Mother was advised on numerous instances that her engagement in a mental health program was crucial to J.W.'s reintegration in Mother's home. However, Mother denied her mental health issues and refused to seek treatment. Mother refused to seek treatment in spite of the district court's specific directive that her enrollment in individual therapy was a prerequisite to the court determining that she was a fit parent. The district court found that Mother's last-minute effort to engage in a program in December 2014 did not sufficiently demonstrate that Mother was committed to treating her mental health for the long term.

The district court did not err in finding by clear and convincing evidence that Mother's unfitness was unlikely to change in the foreseeable future.

*Best interests*

The court must now review whether the district court abused its discretion in determining that termination of Mother's parental rights was in J.W.'s best interests. See K.S.A. 2014 Supp. 38-2269(g)(1); *In re R.S.*, 50 Kan. App. 2d at 1116. In making such a determination, a district court must give primary consideration to the physical, mental, and emotional needs of the child. K.S.A. 2014 Supp. 38-2269(g)(1).

Here, the district court reasonably concluded that terminating Mother's parental rights was in J.W.'s best interests. J.W. struggled with behavioral issues, often displaying signs of aggression toward other children and his teachers. For 3 years, J.W.'s case was pending before the district court. The district court finally decided to terminate Mother's parental rights. During that time, J.W.'s behavioral issues showed improvement during periods of stability and permanency. In contrast, J.W.'s behavior seemed to be negatively

10

impacted when Mother's visitation resumed in July 2014. Given that after 3 years Mother was only visiting J.W. for 1-hour supervised visits and that Mother still had not established a meaningful parental relationship with J.W., the district court was justified in determining that J.W.'s mental and emotional needs would best be served by terminating Mother's parental rights

The district court did not abuse its discretion by terminating Mother's parental rights after finding that such termination was in J.W.'s best interests.

Affirmed.